## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANTZ T. EXCELLENT**<br>**30 Runnemede Ave.**<br>**Lansdowne, PA 19050** | : | |
| | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | **NO.** |
| | : | |
| **v.** | : | |
| | : | **COMPLAINT** |
| **BRYN MAWR BANK CORPORATION d/b/a** | : | |
| **BRYN MAWR BANK COMPANY,** | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| **801 Lancaster Avenue** | : | |
| **Bryn Mawr, PA 19010** | : | |
| **Defendant** | : | |

### COMPLAINT

1.      Plaintiff Frantz T. Excellent, an African-American adult male has been discriminated against on account of his race and retaliated against for asserting and supporting his and others' rights to be able to work in an atmosphere free of racism and discrimination. This includes his standing up for the rights of his subordinate, Alicia McDaniel, an African-American Universal Banker, while working in Defendant's banking branch in Media, Pennsylvania.  He has been subjected to a hostile and illegal working environment which pervades Bryn Mawr Bank Corporation, all of which is countenanced and supported by management. Although long subjected to discrimination beginning in August of 2018, he was ultimately fired on September 23, 2019 because of his race and in retaliation for his reports of discriminatory treatment. Both his and Ms. McDaniel's  chief racial tormentor was Laura Biernacki, Regional Manager for Defendant, whose behavior was supported and countenanced by management. After complaining

1

of discrimination internally and validating what transpired with respect to racial discrimination and retaliation, Mr. Excellent now seeks to recover compensatory and punitive damages from Bryn Mawr Trust Company pursuant to 42 U.S.C. § 1981.

## PARTIES

2.     Plaintiff Frantz T. Excellent ("Mr. Excellent" or "Plaintiff") is an adult African-American male born on October 25, 1969 residing in the Commonwealth of Pennsylvania

3.     Defendant, Bryn Mawr Bank Corporation d/b/a Bryn Mawr Bank Company ("Defendant", "BMT" or, the "Bank") is a publicly-traded commercial bank, headquartered at 801 Lancaster Avenue in Bryn Mawr, Pennsylvania.  The Bank employs approximately 600 employees.

4.     At all relevant times hereto, Defendant acted by and through its duly authorized actual and/or apparent agents and employees acting within the course and scope of their actual and/or apparent agency and employment.

## JURISDICTION AND VENUE

5.     This Court has federal question jurisdiction over the subject matter of Plaintiff's claims under federal law pursuant to 28 U.S.C. §1331.

6.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) and (c) since Plaintiff and Defendants reside in the Eastern District of Pennsylvania and since a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Pennsylvania.

## FACTUAL ASSERTIONS

7.      Prior to his employment with Defendant , Mr. Excellent had a successful stint as a Small Business Development Banker at Citizens Bank's branch in Media, Pennsylvania. He worked there from January, 2015 through August, 2018.

8.      August 6, 2018 was Mr. Excellent's first day as Manager for Bryn Mawr Trust's branch in Media, Pennsylvania. He was also responsible for two mini-branches and supervised four bankers.

9.      It did not take long for Plaintiff to be confronted with Defendant's racism. On Monday, August 20th, 2018, his first day of training, he arrived on time. After spending several minutes finding a parking spot, he approached the branch's back door.  Laura Biernacki, his Regional Manager, was standing outside talking on the phone. Notwithstanding that this was Plaintiff's first time meeting her, and that a  grace period  of time was customarily extended for trainees, she extended nothing in the way of "hello", or "welcome".  Instead, her first comment was "You're late." Plaintiff looked at his watch. It was 8:31 a.m. and he explained that he was looking for a place to park in a very congested parking garage. Ms. Biernacki then lectured him about the role of a leader and being on time.  Plaintiff was silent, dumbfounded and shocked by this initial encounter.  Ms. Biernacki then quizzed him about whether he received her emails, lecturing him to read all emails.  Startled by all of this, all that Plaintiff could say was… "okay". In contrast multiple Caucasian trainees arrived after Mr. Excellent, but none were reprimanded by Ms. Biernacki in any manner.

10.     From that moment on, Plaintiff  had a very uneasy feeling about working with Ms. Biernacki, who treated him as a lackey rather than a leader.  Furthermore, Ms. Biernacki instructed Plaintiff to take daily notes about the activities of another African-American employee

at the Media branch, Alicia McDaniel. It was Ms. Biernacki's racism on the one hand, versus

Plaintiff's race and his standing up for the rights of Ms. McDaniel and himself on the other, that

would eventually cost him his job.

11.     During his first week of training, Plaintiff was informed by Alicia McDaniel that

another co-worker was on the telephone crying hysterically. Plaintiff went to find out what had

happened and saw that Charlotte Schenkel was in tears and shaking at her desk. Plaintiff called

Ms. Schenkel into the conference room and asked her what was wrong. She told him "I

received a call from Laura Biernacki asking me all kinds of questions about Alicia and you and

Marie…she was asking me questions about what do I see Alicia doing and what I observed about

you and what is Marie doing…I told her, no, I am not going into this with her. I refuse to spy on

my colleagues for her. That is not what my job is. I am here to do my job, not be a spy. I refuse

to do that." Plaintiff decided not to report this matter to Human Resources ("HR") as he was new

to the branch and was fearful of some form of retaliation. All he wanted to do was protect his

staff and his branch. He assured the staff that he would be there for them every day, every step of

the way.

12.     The following week of August 27th, 2018, Plaintiff had his first one-on-one

meeting with Laura Biernacki in the Media conference room. The meeting involved

expectations, training schedules, scorecards and Plaintiff's role as a branch manager. When Ms.

Biernacki asked Plaintiff about what he had observed of his staff with respect to their meeting

goals and expectations, Mr. Excellent responded that he was working with four women with four

distinct personalities and that the main thing he wanted to accomplish was to have everyone

working together to help customers and assist each other, no matter what. Plaintiff clearly told

her that he was and would remain on their side. Notwithstanding, she went on to criticize certain

individuals as not being "flexible to change", " stuck with their old ways of doing things", and "not receptive to new changes." When she returned to the subject of Ms. McDaniel, she said " I am sure you've heard, Alicia was transferred from another branch, Ardmore, and we're still observing to see how her potential can grow…" Clearly this was to paint suspicion in Plaintiff's mind and divide Plaintiff from Ms. McDaniel, placing her in a false light. In point of fact, Defendant's Human Relations Department, given its perverse policy and practice of protecting racial harassers such as Ms. Biernacki, had Ms. McDaniel transferred from Ardmore to Media after Ms. McDaniel made complaints about Ms. Biernacki's racist ways. This was supposedly to separate Ms. McDaniel from Ms. Biernacki. However, Media remained in Ms. Biernacki's region. Ms. Biernacki omitted to tell Plaintiff that, in fact, she was the cause of the transfer. As Defendant allowed Ms. Biernacki's territory to include Media, this simply gave further support for Ms. Biernacki's tormenting of Ms. McDaniel. At this point, as Plaintiff pointed out, Ms. McDaniel had only been at Media since July.

13. Ms. Biernacki was clearly fixated on Ms. McDaniel and was determined to place her in a false light, ominously saying, "I don't know if you are aware of the circumstances that had brought Alicia to the Media branch…". She would not tell him more, let alone disclose that it was her own racist behavior resulted in Ms. McDaniel's transfer. Plaintiff quickly said, "Look, I know very little of the 'situation' of her transfer. My focus is, while Alicia is here with me at this branch, I will share all I know with her and the other ladies. I will show them my methods of sales to help them achieve their best and make their goals. I need them to show up on time, be the professional bankers that are expected of them, take care of their customers first and each other…that's all I am interested in." Ms. Biernacki then said "Good, as long as you understand your role as a leader and coach… they are a team working under you. It is important

they follow your coaching…you have your own responsibilities that you have to follow as well…" Notwithstanding those responsibilities as outlined by Ms. Biernacki, during the remainder of his career with Defendant, Ms. Biernacki made a deliberate point of continuously inserting herself, interfering with Plaintiff's responsibilities, and undercutting him. She concluded this conversation by saying: "There are some things we can discuss face-to-face or over the phone…and there are things that need to be documented… documentation is important." Plaintiff was confused and concerned over this statement thinking that Ms. Biernacki was not being above-board.

14. When Ms. McDaniel was notified on August 13, 2018 by Plaintiff that she was officially being transferred to Media, Ms. McDaniel wrote to Ms. Nicola Fryer of HR questioning this in light of Ms. Fryer's previous statements to the contrary. Ms. Fryer's September 7, 2018 response was to indicate that Plaintiff should not have so notified Ms. McDaniel who was Plaintiff's banker, for whom he was responsible in the Media branch. Clearly Plaintiff was not fabricating matters about Ms. McDaniel's assignment to Media, where she has remained to this day.

15. Ms. Biernacki's harassment through micro management of Plaintiff included forcing him to write up subordinates for discipline, despite there being no basis for doing so.

16. At a meeting on September 13, 2018, Ms. McDaniel and Plaintiff went over Ms. McDaniel's concerns about being assigned to Media. Plaintiff concluded that a meeting needed to take place as soon as possible with Plaintiff, Ms. McDaniel, Ms. Biernacki, Ms. Lindsay Saling, and Ms. Fryer from HR. On September 14, 2018, Plaintiff wrote to those parties suggesting such a meeting. However, a decision was made by Ms. Fryer that such a meeting was not necessary. A patronizing proposed email draft to Plaintiff was circulated first by Ms. Fryer to

6

Ms. Biernacki and Ms. Saling, before it was sent to Plaintiff. Again, it emphasized the

"temporary" nature of Ms. McDaniel's assignment, which assignment has continued until this

very day.

      17.     On September 21, 2018 Plaintiff received an email from Alicia McDaniel stating

as follows:

> Hi Frantz,
>
> I have a major concern. Laura Bernacki is currently on the phone line with
> Charlotte [Schenkel] and Marie [Dow] grilling them about what I am doing on the
> Teller Line. She has made several comments about me not performing my "UB
> duties." Charlotte and Marie shared with Laura that I am working hard and have
> made several calls from the CRMS list, opened several accounts, recently
> processed 3 credit cards which were all approved, and have assisted them with
> Branch functions. I am going above and beyond my job responsibilities. I am
> extremely uncomfortable with the harassment and racial discrimination. I am
> uncomfortable with the drill servant mannerism that Laura Bernacki has
> succumbed me to. Its clear to me that I am not good enough for her standards.
> This is all done in retaliation to my filing with HR and the EEOC.
>
> After speaking with Laura, Charlotte just confirmed with me that "Laura is out to
> get me."
>
> At this point, I am under extreme distress and it's clear to me that I am constantly
> being violated of my protective rights here at BMT
>
> With concern,
>
> Alicia

In turn, Plaintiff urged his team to meet with respect to this. Immediately after the meeting,

Plaintiff related the concerns to  HR, Ms. Biernacki, and Ms. Lindsay Sailing, via email, insisting

that this matter be elevated to HR and that a meeting should be scheduled.

      18.     Ms. McDaniel sent an email to CEO Frank Leto with respect to the above-

referenced concerns on September 24, 2018 indicating that this was only the latest evidence of

harassment by Ms. Biernacki. Validating and memorializing Plaintiff's attempts to get things resolved, she stated that "My acting manager, Frantz Excellent has requested a meeting with HR, Lindsay Saling and Laura Biernacki. ." She went on to ask the following of Mr. Leto, " Can you please explain to me why Laura Biernacki is still employed at BMT?" .  Ducking any responsibility, Mr. Leto forwarded her email to Ms. Gina Marandola-Tincu who set forth BMT's standard pablum both to Ms. McDaniel and Plaintiff:

> BMT takes seriously our commitment to a work environment in which all individuals are treated with respect and dignity. Pursuant to our Harassment and Discrimination Prevention Policy, we task every employee to report conduct that he or she reasonably believes may constitute discrimination, harassment, or retaliation. We are committed to fairly and promptly investigating and addressing any such allegations. Further, BMT will not tolerate reprisals against anyone who reports or participates in an investigation of such reports in good faith.

Of course, both Mr. Leto and HR ignored the question altogether as to why Ms. Biernacki was still tolerated and remained employed by BMT.

19.      On September 25, 2018, Plaintiff was interviewed by Ms. Marandola-Tincu with respect to Ms. Biernacki.  His interview was deliberately scheduled prior to Ms. McDaniel's interview. He was criticized by Ms. Marandola-Tincu for following the chain of command by requesting a meeting to include Ms. Biernacki. Ms. Marandola-Tincu emphatically warned him not to do this again.   Plaintiff said that he sensed Ms. McDaniel's frustration with the transition to Media and thought it would be good if someone in HR would contact her more frequently so that she would know that someone was listening to her. HR  did not want to hear such a suggestion and did not follow through with it. Also interviewed was Tyrell Ramirez who told HR that he felt that Ms. Biernacki's behavior was race-based, including comments about incompetent tellers, given that that the two tellers behind the line were African Americans. When

asked if he was aware of Plaintiff's emails he said "yes" and thought it was "amazing" that a new manager like Plaintiff was "stepping up."

20.     With her paystub not reflecting a payout for the third quarter of 2018, Ms. McDaniel wrote to Plaintiff on October 19, 2018 as follows: "Hi Frantz, I am reaching out as a follow-up to our discussion on Wednesday regarding scorecards and incentive payments. This morning, my paycheck did not reflect a payout for Q3. Can you assist me with this matter? I am requesting to escalate the matter to HR and Lindsay Saling. Thank you," Despite the fact that Plaintiff, in turn, passed on Ms. McDaniel concern, no response ever came.

21.     On Thursday, October 25th, 2018, Plaintiff met with Laura Biernacki and her immediate supervisor, Lindsay Saling. They both came in to witness Ms. Biernacki issuing Plaintiff a "memo warning" regarding his work performance with respect to internal reports and other undefined "management performance." The "written memo" was unwarranted. After the meeting was over Ms. Biernacki said to Plaintiff, "I know everything that is going on at this branch...I have my eyes everywhere. Your leadership style is not up-to-par with BMT. This isn't Citizens[Bank]. We do things my way, around here...the way I ran my branches at Continental Bank. I will be keeping my eyes on you." Plaintiff clearly took this to be an expression of a racially discriminatory agenda of Biernackl's to be rid of him and other employees of color. Her interference and threats came amidst an environment in the Media Branch where Plaintiff and his staff were constantly juggling multiple functions. Daily goals and priorities included: customer service and issues, platform/teller duties, answering phone calls, responding to emails from multiple departments, writing reports, etc. It was non-stop. Given the situation Plaintiff prioritized customer needs first, then branch functions/duties.

22.      On December 14th, 2018, Plaintiff was introduced to a representative from Human Resources, Ms. Barbara Pope, an African-American. Plaintiff, Ms. Pope and Ms. Biernacki gathered in a conference room for a "meeting". Ms. Pope introduced herself and said she had been employed with BMT for only two weeks. She explained that she came with Ms. Biernacki as a "witness" or "representative of HR" at Ms. Biernacki's request. Ms. Biernacki was issuing Plaintiff a "performance memo". This was a warning that Ms. Biernacki had originated falsely, claiming that Plaintiff was not turning reports in on time and that Plaintiff was inaccurate in terms of the performance reviews he had made.   Plaintiff, Ms. Pope and Ms. Biernacki had one additional meeting a few weeks later to recap Plaintiff's personal review. Within less than two months of employment with BMT, and within two weeks of stating at a Manager's meeting that her job was to protect the bank's interests, Ms. Pope abruptly left the bank. "Protecting the bank's interest" has been and remains an ever present theme at odds with upholding applicable civil rights laws when it comes to Defendant, its management and HR.

23.      On March 6, 2019, Plaintiff sent an email to Ms. McDaniel on the subject of NMLS ("National Mortgage Lending Servicing") requirements. Contrary to Defendant's actual practices, Plaintiff and Ms. McDaniel shared the view that a banker cannot speak with a customer regarding mortgages or home loans without an NLMS certification which required yearly updates.  Plaintiff learned that she had previously made a request for certification to BMT management and was turned down for having criticized underwriting and loan servicing team members who did not receive NMLS certification. When Ms. McDaniel was promoted, she did get her certification. Notwithstanding upon information and belief, there are those at BMT lacking the requisite certification who speak to customers about mortgages and home loans.

24.      Also, on March 6, 2019, Ms. McDaniel sent a memo to Ms. Nancy Pinkowicz and

Ms. Marandola-Tincu of HR beginning with "I am dissatisfied with my annual performance

review." The second paragraph states that "I am aware that my Regional Manager, Laura

Biernacki, altered my scorecard results as a retaliation tactic to use against me. My manager's

original notes and favorable comments were scrutinized and dissected apart by Laura Biernacki.

Eventually, my Manager succumbed to the criticism and submitted ' bland and blanket'

comments. Due to my report of racial discrimination to senior management, HR & my

subsequent filing with the EEOC, I have been subjected to a hostile work environment,

particularly under the leadership of Laura Biernacki." In point of fact, Biernacki repeatedly

interfered with Plaintiff's annual review of Ms. McDaniel for 2018.  Plaintiff gave Ms.

McDaniel an exceptional rating as she  had achieved and exceeded every goal needed from

previous quarters. When Ms. Biernacki saw that Plaintiff gave her such high marks, she

criticized the review and inappropriately injected herself into the review process, not once but

repeatedly until Plaintiff capitulated. .   In a late afternoon phone call with Mr. Excellent, Ms.

Biernacki said that Plaintiff's review was inaccurate, saying "Are you sure you did this review

correctly…. No one in the company, even the CEO had not received such high marks."

Plaintiff's response was to say " Look at her numbers. Alicia exceeded her goals, above and

beyond, with my coaching and guidance. Look at her numbers…." Nonetheless, Ms. Biernacki

kept at it repeatedly no less than three times in insisting that Ms. McDaniel's evaluation be

downgraded.

25.      On  August 27th, 2019, Plaintiff had his "disciplinary" bi-weekly meeting with

Laura  Biernacki and HR Representative  Jerry Cary.  When it came to going over Plaintiff's

reviews of others, Ms. Biernacki tore into Plaintiff for his rating of Alicia McDaniel saying

"Let's look at your quarterly reviews. The scoring was not done correctly. You gave Alicia a "5" rating. From looking at this, are you telling me Alicia is **the best** at everything? Even our CEO Frank Leto doesn't have a "5"-rating. Are you telling me Alicia is better than everybody in the company?"  Plaintiff said, "I can't speak for everybody in the company but, pretty much…yes." Plaintiff went on to say "Everything I had asked Alicia to do, she has done them on time and exceeded my expectations on them. She goes beyond just the problem-solving. Alicia comes to me with new ideas that could benefit the bank and our customers. You see her scorecard." In characteristic fashion when it came to Ms. McDaniel, Ms. Biernacki insisted that Plaintiff rework Ms. McDaniel's review. Plaintiff was infuriated because of Ms. Biernacki's lack of support and insinuation that he was favoring fellow African-American Alicia McDaniel, when in fact her numbers spoke for themselves.

     26.     On August 29th, 2019 Plaintiff called Ms. Biernacki regarding Ms. McDaniel's review telling her that he made a small downward adjustment in Ms. McDaniel's rating to over "4", which meant that she exceeded expectations. He said that she had exceeded everything that is required of her. Ms. Biernacki curtly insisted that she would look over the report again and that she had to go. That was the end of that conversation. Plaintiff was well aware of Ms. Biernacki's racist fixation on Ms. McDaniel and himself when it came to denigrating and penalizing them.   As per his deposition testimony in conjunction with Ms. McDaniel's lawsuit and the other cases consolidated for discovery:

> You know, and it's not just one time or two times, but more than two times. Like more than three times for me to redo a review that you asked me as a manager to do based on my observation and my assessment and you're telling me it's wrong, why would you do that towards my towards my employee, my black employee? (Excellent Dep at 347, lines 7-13)

27.      After a successful first quarter in terms of branch sales performance, in April of

2019, Plaintiff submitted his quarterly report to Laura Biernacki. Again, as was the case with his

evaluation of Ms. McDaniel, Ms. Biernacki was not satisfied with what he submitted. She asked

him to re-examine his report. He did and submitted it to her again. Ms. Biernacki then

telephoned him and asked him if he was familiar with the concept of "gaming", accusing

Plaintiff of "falsifying sales numbers" to attain the branch's goals. This was a totally false

accusation as Ms. Biernacki was well aware.  At about the very same time, the same accusation

of "gaming" was made against Ms. McDaniel who in turn wrote to HR on April 24, 2019.

Plaintiff brought forward proof of emails and documentation, including documentation as to Ms.

Biernacki's own personal approval of  the shared credit transaction supposedly underlying her

claim of gaming and falsification. (See par 28 hereof) Ms. Biernacki and Defendant backed away

from these false charges. However, in typical fashion when it came to those who complained of

discrimination, HR sought to discredit Ms. McDaniel and Plaintiff. Notwithstanding, the fact that

Plaintiff and Ms. McDaniel both heard Ms. Biernacki accuse them of "gaming" and falsification,

in typical coverup fashion, HR representative Corey Crapella, in an email of June 3, 2019,

concluded that Ms. Biernacki never made those accusations. .

28.      Ms. Biernacki's race-based interference extended beyond Plaintiff's reviews and

daily business at the branch. She also attempted to dictate who received credit for originating

new business.  During the first quarter period (January-March 2019), a loan of $300,000.00 had

been approved where two of Plaintiff's staff, Alicia McDaniel (African-American) and Marie

Dow (Caucasian) had legitimate rights to receive credit for this loan. Plaintiff told Ms. Biernacki

the reason why both these employees had a rightful claim to this loan. Notwithstanding, Ms.

Biernacki contended that Ms. McDaniel, the African- American, should not get credit for the

origination, stating to Plaintiff, " I can see how Marie can receive credit for this loan, but Alicia? She just got to your branch. How was she involved to receive credit?" She said that if both employees would agree in writing that the loan credit should be split between them, then they will both receive credit. This agreement was reduced to writing and approved by Plaintiff. Ms. Biernacki then changed her position again, claiming that the credit should either go to one or the other employee. A meeting was subsequently held with Ms. Biernacki, Ms. Lindsay Saling, and Corey Crapella of HR to go over this matter. It was determined that each employee would receive one-half of the credit for the loan. Notwithstanding, compliance with what Ms. Biernacki required in order to get joint credit, she continued to complain about Ms. McDaniel.

29.    As was the case described hereinbefore, Ms. Biernacki made it a practice of bringing representatives of HR with her to meetings with Plaintiff so as to intimidate Plaintiff. On May 14, 2019 Plaintiff had another meeting with Mr. Crapella  and Ms. Biernacki. Ms. Biernacki went over matters such as sales, tracking, goals, scorecards and employee performance. She went over points Plaintiff did not agree with, repeatedly pulling rank when it came to justifying her assessment. The meeting ended.  However, two weeks later, Plaintiff had an additional meeting with  Mr. Crapella and Ms. Biernacki wherein Ms. Biernacki did not agree with his personnel assessments and those with respect to his staff. As was the case with Ms. Pope, Mr. Crapella  left the bank after a very short tenure.

30.    On July 10, 2019, Plaintiff  had a meeting with Ms. Biernacki and Lindsay Saling at the Newtown Square branch for his own personal assessment and review. Plaintiff was given the same criticisms that had been leveled before, along with the new and amorphous assertion consisting of "not embracing the BMT philosophy". Ms. Biernacki now claimed that the bank had received a significant complaint from an "important" client the day before. She said the

14

client expressed how poorly he and his wife were treated by Mr. Excellent's staff during a visit

to the branch. Plaintiff found that hard to believe given his own personal interaction the previous

weekend with those very same clients where they expressed their gratitude. Moreover, this

couple always came to Plaintiff's branch for service and deposits. On the day of Plaintiff's

review, he was told not to contact them. This was another setup by Defendant. Notwithstanding.

when both customers subsequently came into the branch, Plaintiff respectfully inquired as to the

nature of their displeasure. The customer's wife said , "I just made a comment to a banker at

another branch that Media's bankers are always busy and taking care of customers on both sides.

I just thought that was too much for a Saturday. My husband and I LOVE coming to this branch.

It is close to us and we ALWAYS receive great customer service. I just mentioned this to another

banker at another branch… I did not realize it would cause contentions." Notwithstanding, the

obvious falsity of Ms. Biernacki's claim, she had clearly placed Plaintiff in a false light and

defamed Plaintiff as her allegations became known to other managers who mentioned this to

Plaintiff at a Managers' meeting. This time, Ms. Biernacki warned that if Plaintiff's

performance did not improve, action of final termination would take place. Once again, Plaintiff

disagreed with this assessment and did not sign his review.

31 .     On July 17th, 2019, a Managers' meeting was held in the Newtown Square

branch. Meetings such as this one are designed to recap Market 2 which is Ms. Biernacki's

market and to go over numbers and planning for each of the branches' action plans to achieve

various goals. During the course of the meeting, Plaintiff heard intimidating threats from Ms.

Biernacki about what would happen if branch managers did not meet each of their specified

goals. Also, Ms. Biernacki made a statement regarding staffing, as branches had lost personnel.

"If you know you don't have enough staffing at your branch, that's on you. Don't make me have

to staff your branch for you. You may not like my choices for your staff." Clearly this was part and parcel of her clear intention to rid her region of black employees. She then went on to say, "I know, I can look at someone and know **exactly** what kind of person they are just by looking at them for the first time…" This comment had clear racial implications and was objected to. Ardmore Branch Manager Betty Silfa, an Hispanic woman, raised her hand and said, "Whoa…wait a second…you're saying you can look at someone **for the first time** and know **exactly** what kind of person they are, how do you determine that?"(**emphasis added**) Ms. Biernacki quickly replied and said, "Generally… I can get a good read on a person from a first meeting, a first glance." There was a lot of uneasiness in that room following her assertion. Plaintiff and Ms. Silfa clearly understood this comment as having racial overtones. During a telephone conversation after the meeting, Plaintiff and Ms. Silfa shared their sense of outrage. Plaintiff came to learn about Ms. Silfa's more than forty years of retail, commercial, private and international banking experience which contrasted with her experience when it came to race and the hostile environment she experienced while working for Defendant.

32.     On July 24th, 2019, at yet another meeting with Ms. Biernacki, Plaintiff was introduced to a third HR representative Mr. Jerry Cary. It was noted that Mr. Cary had only been with the Bank for approximately three weeks and he was taking over from where "Corey left-off". This was the third new HR person that Plaintiff was subjected to. Both he and Ms. Biernacki sat with Plaintiff in the Media branch conference room. They went over performance updates and Mr. Cary took notes. Ms. Biernacki mentioned that there were "improvements" in Plaintiff's performance since their last meeting.

33.     Given all of the instances of obvious intimidation, harassment and racial discrimination directed by Ms. Biernacki against Plaintiff and others of his race, going back to

his first exposure to her,  on August 6, 2019  Plaintiff actually went so far as to draft a

resignation letter. However, he withheld submitting that  letter given his commitment to his co-

employees and a staffing shortage at the branch.

34.     At approximately the same time that Plaintiff was drafting his resignation, fellow

BMT Branch Manager and person of color, Betty Silfa actually did resign from her position,

effective August 28, 2019, specifically due to  racial harassment and intimidation by Ms.

Biernacki. This was within a few short weeks of that managers' meeting described in paragraph

31 hereof. Ms. Silfa put in her resignation specifically as a result of Defendant's discriminatory

practices and hostile environment.  This was  after expressing her concerns to management and

HR in July of 2019. Plaintiff learned of her resignation on August 13, 2019. On September 4,

2019 Ms. Silfa wrote HR Business Partner Jerry A. Cary a blistering email asking "Why does

Laura want to fire and wire up every non white employee that makes a mistake; rather than

coaching them, and protect and transfer white employees to other branches?"  After repeatedly

receiving the same standard  parroted pronouncement  that HR takes racial concerns seriously,

Ms. Silfa emailed HR Business Partner Jerry A. Cary and HR employee Nicola Fryer on

September 17, 2019 stating:

> Your follow up email stated that you take these allegations very serious and I
> provided both of you with more than enough details for your investigation. As I
> stated earlier these behaviors have been tolerated long before I got there and every
> non white employee continues to be a victim of these discriminatory malpractices.
> I don't think that another in person meeting is beneficial since you continue to
> allow one individual to bully and abuse people in the organization who need their
> job. I don't want to be part of such culture…….

35.     On a daily basis Plaintiff witnessed Ms. McDaniel's struggle. He was  well aware

of the fact that Ms. McDaniel experienced nervous breakdowns as a result of Ms. Biernacki's

relentless racial harassment, because  it was Plaintiff who spoke to Ms. McDaniel and calmed

her down from persistent crying and those breakdowns.   At one point, Ms. McDaniel said that she wanted to quit right then and there. She kept saying "the reason I don't quit and leave this situation right now, is because of you guys. I don't wanna feel like I'm letting you or my colleagues down." Plaintiff reassured her that he was on her side and had her back as a colleague and a stellar employee.

36.     On Friday August 30th, 2019: Zarouhi "Zee" Nasir, a Media employee of Iraqi descent, who identified herself as being Lebanese, put in her two weeks-notice after over twenty years  of employment with Bryn Mawr Trust. Prior thereto she had expressed to Plaintiff several times that she needed a better paying position with benefits. Plaintiff coaxed her to call Ms. Biernacki , who never responded. to Ms. Nasir. Plaintiff sent emails to Ms. Biernacki for a listing of open positions, which was declined by Ms. Biernacki.  This behavior was consistent with Ms. Biernacki's discriminatory behavior when it came to  non-white employees. In Ms. Nasir's case, Ms. Biernacki had gone so far as to criticize her accent and claim that she was incompetent. As a result of being ignored by Defendant, Ms. Zee went on to take another position with another bank.

37.     On Monday, September 23rd, 2019 Ms. Biernacki insisted that Plaintiff have his bi-weekly meeting with her and HR employee Jerry Cary at the Bryn Mawr branch. That afternoon, Plaintiff arrived at 3:45pm and Ms. Biernacki walked him upstairs to Mr. Cary's office. She had a small, yellow, legal piece of paper in her hand. She began by asking Plaintiff if he remembered completing the manager's checklist,  which he had already done and gone over with another manager, Jim Sredenschek. Plaintiff's response was : "Yes, Jim and I completed them." She then changed the subject to ask about manager developmental training which Plaintiff was supposed to do online. Plaintiff's response was: "Yes, I believe I completed them. I

believe I completed all of my trainings." She said, "No. You did not complete these

trainings…not only did you not complete these trainings, there are lots of other things, so…I

have not seen any improvements so we will have to terminate you." Not only did this completely

surprise Plaintiff, but came in complete contrast to Ms. Biernacki' statement  two months

previously that Plaintiff had improved. Plaintiff was told that if he had any personal belongings

at the branch, that they would be mailed to him. The meeting ended at 4:00 p.m.

38.     Mr. Cary, himself an African-American was the third HR representative that

Plaintiff was to deal with given the disappearance of others. . At some point, Plaintiff asked him

if BMT was where he really wanted to be, cautioning him that the place it not what Mr. Cary

thought  it was. Indeed this proved to be true. Mr. Cary, was subsequently elevated  by

Defendant to  Chief Diversity Officer at the end of January of 2021 with some fanfare given all

the race claims against BMT.  However, like the others from HR,  shortly after monitoring

depositions in those  discrimination cases consolidated for discovery in the Spring of 2021,  Mr.

Cary disappeared from Defendant's employ.

39.     A little more than one week after Mr. Excellent was fired, on October 3, 2019,

Ms. McDaniel wrote to members of the HR department with a copy to CEO Leto . In pertinent

part she says the following:

> I have previously registered complaints with regards to racial discrimination and
> retaliation as well as retaliation from whistleblowing, particularly from Laura
> Biernacki. It's clear that BMT continues to protect a racist, dictator and a
> narcissist who lacks humility and leadership.
>
> From the start of her employment with BMT, Laura has been determined to "get
> rid of" individuals who are not top sellers and those whom she cannot intimidate
> or bully, including minorities. She overly documents incidents to scapegoat
> individuals by making the person appear as the villain.
>
> Under her leadership, the morale is steadily declining. The whispers, the gossip,
> the complaints of anguish about Laura Biernacki are unbearable. Those under

Laura Biernacki in Market 2 are afraid and perturbed by her. Additionally, they are terrified to speak with HR due to trepidation of retaliation or even termination as HR merely sides against those who complain.

Monday, September 23, 2019 is the day the fear was heightened by BMT and the Media Branch in particular lost a pillar. Frantz. T. Excellent. Frantz restored a broken Branch. He was the perfect example of a true leader. He arrived early, stayed late and he worked in the trenches with his staff. Like me, he is African-American.

Then Ms. McDaniel set forth specifics on Ms. Biernacki interfering with Plaintiff when it came to her review. Ms. McDaniel concludes her email by stating, "If Laura Biernacki continues to be the face of BMT's leadership, the sustainability of BMT will continue to deteriorate." These words also proved to be prophetic.

40 .    It was only after Plaintiff was terminated that he came to a fuller appreciation of the extent of the racist atmosphere at BMT and the extent of the discrimination that was prevalent. Plaintiff learned of the discrimination lawsuits filed by African Americans ( including Ms. McDaniel) and by others who claimed that they were retaliated against as a result of standing up for those African Americans. He realized that he and Ms. McDaniel were not alone. Discovery conducted in those lawsuits confirms the extent of the discrimination and the illegal work atmosphere maintained by the Defendant.

41.    Plaintiff had worked at Bryn Mawr Trust for thirteen months (13) and seventeen days (17).  He was hired as the Manager of the Media branch. His goal was to know his customers, gain their trust, and gain their business. He also wanted to understand and learn the policies and culture of the bank. It took some time to learn the many moving parts required of each branch manager and those reporting to him.  Plaintiff took pains when it came to meeting customers' satisfaction. When it came to staff, he took pains to instill confidence, teamwork and a friendly working environment. However, it was all for naught.

42.          When it came to the Bank's culture, Plaintiff was aghast at the discriminatory practices and racism which were fostered by Defendant and allowed to prevail. Despite written policies purporting to not tolerate racial discrimination, Plaintiff learned that they were all form without substance. Complaints to HR only made Plaintiff's situation worse, with the department acting as a willing lap-dog for Ms. Biernacki. Ms. Biernacki admitted to Ms. McDaniel her willingness to lie for HR with respect to discrimination claims, and was apparently willing to do so because she believed that HR would "have her back." (McDaniel Dep. at 482:5-25, 483:1-12)

43.          In retrospect, it is amazing that Plaintiff was able to accomplish anything during his tenure. Laura Biernacki did nothing but create roadblocks and internal dissension through race-based bullying and intimidation, all with the support of HR and her superiors. She was allowed to instill fear in Plaintiff and other African Americans, even going so far as having a BMT trainer, Ms. Mary Venditti, spy on him and Ms. McDaniel on a regular basis, starting with the beginning of Plaintiff's tenure. She particularly watched Plaintiff's every move. She would often interrupt Alicia McDaniel's breaks to inquire about certain matters at BMT. Mary Venditti would periodically conduct "cross-walks" through the branch, a minimum of twice a week. Most of the time it was very obvious that she was surveilling Plaintiff and Ms. McDaniel, pretending instead to be going to the copier next to Plaintiff's desk. She had stated many times that she is a "company [wo]man" and that "I will do whatever the company tells me to do…" It was clear that Plaintiff and Ms. McDaniel were not considered part of the company.

44.          Interestingly, those accused of discrimination repeatedly disappear from employment at BMT. They include tormentors Retail Banking Head Steve Novak and Branch Manager Therese Trainer. They "resign" and the point is made that it is not because of racist

accusations. In Ms. Biernacki's case, after being afforded unprecedented counseling, by an outside counseling firm, she was fired. A lengthy internal self-serving memo was drafted by HR carefully choreographed Ms. Biernacki's firing so as not to give credence to Ms. McDaniel, Ms. Silva's or Plaintiff's complaints of racial discrimination. To the contrary, HR contended that Ms. Biernacki was terminated on August 4, 2020 for other reasons, embracing platitudes such as "management style" to characterize her misbehavior. Ms. McDaniel was informed by HR that she was no longer with Defendant, with HR making it clear that it was not because of complaints of discrimination.

45.     Plaintiff believes that he was fired as a result of discrimination who was forced to work in a hostile environment. He is an African-American retaliated against because he stood up for himself and the rights of his fellow African-American colleague and subordinate, Alicia McDaniel.

46.     Immediately after Plaintiff's dismissal, African-American, female branch Manager, Teria Everrett of the Swarthmore Branch resigned from her newly appointed position so as to not be in the racially-motivated cross-hairs of Laura Biernacki and the discriminatory and hostile environment fostered by Defendant, She had been with the bank for over twelve years. She rose up from a part-time teller to branch manager on her own motivation. She is now a Manager at PNC Bank, Media.

47.     Of the four people of color who originally worked in Ms. Biernacki's region, Laura Biernacki's racially biased, fear-tactics brought their number to zero. This left no person of color as a manager in Ms. Biernacki's region which was clearly Ms. Biernacki's design all along.

48.     Plaintiff has brought this lawsuit , because speaking out internally when it came to racism at Bryn Mawr Trust only succeeded in getting Plaintiff fired. Plaintiff is again speaking out because he cares. He cared for his customers, his staff and his colleagues. He had their best interest first. He wanted to create a professional and functional working environment with his staff . However, his color and the color of some of his staff got in the way. Defendant allowed Ms. Biernacki, with the aid of HR and management, to intrude upon and frustrate Plaintiff's goals by bullying, persecuting, and retaliating against  him and his staff. For being an African-American who spoke up in support of basic human rights, Plaintiff  was unjustly fired.

49.     Courts have long recognized the fact that instances of racism are not now as blatant or graphic as they once were. The distinct method of proof in employment discrimination cases, relying on presumptions and shifting burdens of articulation and production, arose out of the Supreme Court's recognition that direct evidence of an employer's motivation will often be unavailable or difficult to acquire. See *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) Moreover,  forms of subtle discrimination are actionable. The term "microaggression" was first coined in 1978 by Chester M. Pierce to describe a phenomenon of subtle negative exchanges directed toward African Americans ( Pierce *et al*., 1978)  However, it has more recently come to the forefront in psychology. As recently as December 4, 2020, the Washington Post published an extensive article by Michelle Singletary, wherein she referenced a summer of 2020 Gallup poll which concluded that Black Americans disproportionately experience microaggressions concluding that "The flash points that spark national conversations on racism are often instances of violence, but for many Black Americans, their experiences with mistreatment and discrimination are much subtler and are woven into the routines of their normal, daily lives." Research shows that microaggressions can cause depression and self-esteem issues.

50.     Finally, it is a matter of public record that there are six other discrimination cases

against BMT pending in the United States District Court for the Eastern District of Pennsylvania.

including that of ALICIA McDANIEL  vs. BRYN MAWR BANK CORPORATION d/b/a · ·

BRYN MAWR BANK COMPANY, 19-cv-2419. Discovery has provided unique insight as to

the atmosphere at BMT.   Multiple witnesses have testified under oath about the racist

atmosphere at BMT as well as HR's affirmative support for those who committed discriminatory

acts. Plaintiff's own experience as to being discriminated against in a hostile environment was

confirmed not only by his own deposition testimony and the testimony of others, demonstrating

that a discrimination-free working environment with zero tolerance for discrimination and/or

reprisals has been  a total lie when it comes to actual HR and BMT practice. Just several

examples of testimony include the following :

     - Ms. McDaniel testified in her deposition that Mr. Excellent, on numerous

occasions asked HR to get involved in her situation pertaining to discrimination. (McDaniel Dep

at 537, 538.)

     - When asked why Mr. Excellent was fired, Ms. McDaniel testified that " He was

terminated due to Laura Biernacki's false claims. Very racially charged. " (McDaniel Dep at

553) She went so far as to write to write to HR in protest when it came to Plaintiff Excellent's

termination. (McDaniel Dep at ,554) . Further she testified that his no longer being with BMT

was "the ultimate—the ultimate retaliation."

     - Mr. Excellent also testified in the six lawsuits consolidated for discovery. He

stated that BMT tolerated racism with respect to Ms. McDaniel (Excellent Dep at 14),

characterizing matters as "racial battering" (Excellent Dep at 15) and that he advocated for her

(Excellent Dep at 33) for which he was retaliated. When it came to Ms. McDaniel's situation,

despite his responsibilities attendant to being her manager, Excellent was told by Laura

Biernacki to let HR handle things and not to get involved. (Excellent Dep at 249)  For this, he

was retaliated against. When it came to his own situation he testified " No matter how hard I

tried, no matter what I would have done. I was still a black man within  a white….

organization….. That was clear." (Excellent Dep at 41)   He specifically testified that he was

targeted as a new black manager. (  Excellent Dep at 306) , stating that his interaction with Ms.

Biernacki was very racial and that what she did "was purely racially motivated". (Excellent Dep

at 324, 353)


     51.    Furthermore Ms. Biernacki was examined in those six cases with respect to a

charge she filed with the EEOC under oath subject to the penalty of perjury with the EEOC. This

followed  her long overdue firing, wherein she explicitly impugned the honesty and integrity of

Defendant, HR and Defendant's lawyers when it came to handling complaints discrimination.

Her EEOC Charge specifically includes the following which is certainly applicable to the

situation during Plaintiff's tenure : In clear reference to these six consolidated cases against BMT

before this Court, Ms. Biernacki asserted that she was pressured by BMT not to tell the truth.

Pertinent particulars of the Charge dated September 1, 2020 and signed by Ms. Biernacki

under penalty of perjury are, in pertinent part,  as follows:

> 3.    In or about August of 2018, I was interviewed by an attorney for Respondent regarding an employment discrimination claim brought by a terminated employee, Michael Sutton against Respondent. During the interview the attorney was trying to lead me from saying that I believed his medical situation could have been accommodated better.

> 4.    In or about September of 2018, I spoke with Nicola Fryer in Human Resources and advised her that I was concerned that I was being pressured to give inaccurate testimony in the employment discrimination case.

---

8. In the June and July of 2020, Jerry Cary, Retail's HR Business Partner (who is African American) asked me "have you called your black employees? I asked for guidance about what he wanted me to do because of the racial discrimination lawsuits that were ongoing and an article in the Delaware County Times about how our [sp] the bank President, Frank Leto, was not communicating properly with our African American employees. I wanted to make sure I didn't make anything worse or cause tension, but Mr. Cary would not provide me with any guidance. I believe he was trying to get me to say something about racial issues and then blame me for not doing it properly.

. Of course, as stated hereinbefore, Ms. Biernacki admitted to Ms. McDaniel her own willingness to lie for HR with respect to discrimination claims, and was apparently willing to do as she believed HR would "have her back."

52.. The bottom line for Plaintiff in his own words was " …Because no matter how hard I tried, no matter what I would have done, I was still a black man within a white, you know, organization. So it's –that was clear. That was clear." (Excellent Dep at 41, lines 13-16)

### COUNT I
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

53. Plaintiff restates and realleges all previous paragraphs as though fully set forth herein.

54. Defendant has discriminated against Plaintiff by denying him the same rights as are enjoyed by white employees with respect to performance, terms, location, conditions, benefits, privileges, promotion, discipline and emoluments of their employment relationship with the Bank, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Moreover, Defendant has been retaliated against for standing up for the rights of his African-American subordinate, Alicia McDaniel.

55.    Defendant's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

56.    By reason of the continuous nature of Defendant's discriminatory conduct, persistent throughout Plaintiff's employment with Defendant, he is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

57.    By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under § 1981, including but not limited to monetary and economic damages, damages for mental anguish and emotional distress, reasonable attorney fees and costs, as well as punitive damages.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant and requests an award of damages including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury of eight on all issues triable by a jury.

## CERTIFICATION

I hereby certify that Plaintiff has not brought a similar or related lawsuit encompassing the claims brought in this matter.

Respectfully Submitted,

**MARK D. SCHWARTZ, ESQUIRE**

By: /s/Mark D. Schwartz
      Mark D. Schwartz, Esquire (Pa ID #30527)
      300 Sandcastle Drive
      BRYN MAWR, PA 19010

Telephone & Fax 610 525-5534
Markschwartz6814@gmail.com

**THE PEARLMAN LAW FIRM, PLLC**

By:_____/s/ Jason L. Pearlman_____
 Jason L. Pearlman, Esquire (Pa ID #93879)
 Two Bala Plaza, Suite 300
 Bala Cynwyd, PA 19004
 610-660-7793
 jpearlman@pearlmanlawfirm.com

DATED: August 15, 2021   *Attorneys for Plaintiff Frantz T. Excellent*

28

## VERIFICATION

I, Frantz T. Excellent , do hereby certify that I am the Plaintiff in the within action, and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  I do further understand that these statements are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

_____
Frantz T. Excellent

Dated: 8/15/2021